[No. C033959. Third Dist. Nov. 27, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
CRAIG BOYD DRENNAN, Defendant and Appellant.

**COUNSEL**

Dennis P. Riordan; Donald M. Horgan; and Dylan L. Schaffer for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Stephen G. Herndon and David Andrew Eldridge, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BLEASE, Acting P. J.**—Craig Boyd Drennan, who was superintendent of the Modoc Unified School District, was convicted of violating Penal Code section 632, subdivision (a) (intentional eavesdropping upon or recording of a confidential communication), based upon the installation of a hidden video camera, which took periodic photographs, without accompanying sound, of the area of the desk, computer, file cabinet, credenza and bookcase in the office of the Modoc High School principal.[1]

We will reverse the judgment of conviction because the photographing of the principal's office for a purpose and in a manner which did not reveal the content of any conversation, was not an intentional act of recording a "confidential communication" as those terms are used in section 632.

### FACTUAL AND PROCEDURAL BACKGROUND

Drennan is the superintendent of the Modoc Unified School District.[2] Dewey Pasquini was the principal at Modoc High School during the 1998-1999 school year.

Sometime prior to December 1998, Drennan asked the school district's attorney if it would be lawful to install a hidden camera in Pasquini's office to determine if someone was breaking into Pasquini's office and taking or reading confidential documents. The attorney informed him he lawfully could install the camera as long as it had no sound recording capabilities. Drennan also contacted the school board president and notified him of the camera. Drennan did not tell Pasquini about the camera.

Drennan directed James Lloyd, the maintenance supervisor for the school district, to hire someone to install the camera. The camera was installed in November 1998. After the camera was set up, Drennan viewed a tape of the area photographed. Drennan was not happy with the camera angle, because it showed the entire office. He was only interested in photographing the desk, file cabinets, bookcase, and credenza. The camera was moved two more times before Drennan was satisfied.

---

[1]References to a section are to the Penal Code.
[2]Drennan was on administrative leave at the time of trial.

The camera, hidden in a fake smoke detector, began operating in December 1998. It had no audio capabilities and was positioned to take pictures of Pasquini's desk, computer, file cabinet, credenza and bookcase at the rate of one frame every three seconds.[3] Pasquini's conference table was not in view, and Drennan testified there was no place other than the conference table for someone visiting Pasquini to sit. Twenty-four hours of taping filled one 8-hour videotape. Lloyd changed the tapes each morning, Monday through Friday. No taping was done over the weekend.

Lloyd testified he ran out of tapes on a couple of occasions when Drennan had not returned the tapes to him. On those occasions the camera was not operating. There were also times when the camera was not working because Lloyd was too busy to change the tapes. Drennan testified that he reviewed the tapes, but never saw "any two-party communication at any time while . . . watching any of [the] tapes." Nor was his intention to watch what Mr. Pasquini was doing. Lloyd testified he recalled seeing one of the videotapes, but did not recall seeing anyone in the picture. However, he told a defense investigator he remembered seeing people coming in the room, but only recognized Pasquini.

Drennan directed Lloyd to stop taping in mid-March. The tapes had uncovered no evidence of a break-in of the office. Drennan instructed Lloyd to destroy the tapes and none of them survived to be admitted in evidence.

Pasquini testified that various agencies such as the sheriff's and police department used his office to conduct interviews. Teachers often had discussions with parents in the office as well. Usually, the door would be closed during these discussions. Pasquini felt the conversations which took place in his office were confidential in nature. One student testified he carried on several confidential conversations with Pasquini between November 1998 and March 15, 1999.

A jury found Drennan guilty of violating section 632, subdivision (a). The court sentenced Drennan to three years' felony probation on condition he serve 10 days in the county jail and pay fines and restitution in the sum of $7,010. The court stayed the jail time pending this appeal.

---

[3] We refer to the videotaping as taking pictures, because the camera, which took one frame every three seconds, did no more than take a series of still photos. It is doubtful whether the content of a communication could have been deciphered from such videotaping by (say) lip reading, had there been evidence that such was intended and accomplished. We have no occasion to determine whether such a means of accessing a communication is within section 632.

## DISCUSSION

█ At issue is whether the prohibition on eavesdropping upon a confidential communication, contained in section 632, subdivision (a), extends to the taking of timed still photographs, without accompanying sound.

We conclude it does not, nor does section 632 protect a general right of privacy from unconsented videotaping. Such a right enforced by penal sanctions is to be found in another section of the section 647, subdivision (k).

The trial court instructed the jury that "[c]ommunication . . . is not limited to conversations or oral communications, but rather encompasses any communication regardless of its form, including, but not limited to actions and signs where any party to the communication desires it to be confined thereto."

No evidence was presented that the videotaped photographs captured an image of persons communicating to anyone by means of actions or signs, the content of which could be deciphered. There was evidence that between November 1998 and March 1999, Pasquini's office was used to conduct confidential conversations. Although there is no direct evidence that such conduct was in fact photographed, it is inferred that it did occur in the manner permitted by the method and extent of the videotaping. Consistent with this inference, the People contend that section 632 prohibits the mere taking of the pictures of persons engaged in a confidential communication, and the term "recording" need not include the content of the communication.[4]

The People rely on *People v. Gibbons* (1989) 215 Cal.App.3d 1204 [263 Cal.Rptr. 905], from which their theory was apparently derived. *Gibbons*

---

[4]At trial, the prosecutor went further, telling the jury section 632 prohibited the video recording of mere conduct carried on in private. When defense counsel asked Pasquini whether the camera recorded any confidential communication Pasquini had with another person, the prosecutor interposed a speaking objection: "[T]hat misstates the law. It doesn't have to [be] a confidential communication with anybody else. It can be conduct by oneself."

In closing argument the prosecutor stated: "[T]here's no requirement that anybody other than Mr. Pasquini be videotaped under that statute. Mr. Pasquini is in there and I asked him: Mr. Pasquini, is this your office? And he assumes that the door is closed and he assumes that what he's doing is private. He's got a right to do that. If he needs to pick his nose, he can pick his nose and nobody will record it. If he needs to scratch himself, same thing. Whatever. He's got a right to privacy in his own office . . . ."

The prosecutor's interpretation was clearly wrong. Section 632 prohibits the recording of a communication carried on "among the parties . . . ." This requires the recording be of a communication between parties, not merely of the conduct of one or more persons.

held that a defendant who secretly videotaped his acts of sexual intercourse with various women violated the statute. *Gibbons* reasoned it "cannot be readily disputed" that "sexual relations is a form of communication, be it communication of love, simple affection, or, simply of oneself . . . ." (*Id.* at p. 1209.) It acknowledged that "certain terms used in the privacy act, such as 'eavesdropping,' 'amplifying device' and 'telephone,' might suggest a narrow definition of communication, synonymous with conversation. However, [the court said] Penal Code section 630 expressly states the intent of the Legislature to protect the right of privacy of the people of this state. Consistent with the express declaration of intent and in the absence of any express statutory limitations, we find that 'communication' as used in the privacy act is not limited to conversations or oral communications but rather encompasses any communication, regardless of its form, where any party to the communication desires it to be confined to the parties thereto." (*Ibid.*)

We disagree both with this manner of statutory construction and with the conclusion reached.

█ In interpreting a statute, the touchstone of meaning is the language used by the Legislature. (*Zabetian v. Medical Board of California* (2000) 80 Cal.App.4th 462, 466 [94 Cal.Rptr.2d 917].) If the language is clear and unambiguous, we need not engage in judicial construction. "Whether that is the case can be determined only when the language is sought to be applied to the case at hand. Each party will normally advance a candidate meaning of consequence to the party's position. If it cannot be determined from the language of the statute which is the correct application, extrinsic aids may be employed bearing on the objects to be achieved, the evils to be remedied, and the legislative history of the enactment. [Citation.] We call this an inquiry into legislative intent, i.e., an inquiry into the plausible meanings to be ascribed to the language in view of the history and context of the legislation. It does not sanction a judicial construction predicated upon a perceived policy which is not within the semantic constraints of the statutory language. 'The Legislature may make no law except by statute . . . .' (Cal. Const., art. IV, § 8, subd. (b).)" (*Id.* at pp. 466-467, fn. omitted.)

█ In this case the language of both sections 630 and 632 rules out the construction placed upon the term "communication" by the *Gibbons* court. Section 632, subdivision (a), states in relevant part: "Every person who, intentionally and without the consent of all parties to a confidential communication, by means of any electronic amplifying or recording device, eavesdrops upon or records the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be

punished by a fine not exceeding two thousand five hundred dollars ($2,500), or imprisonment in the county jail not exceeding one year, or in the state prison, or by both that fine and imprisonment."[5]

The statute is replete with words indicating the Legislature's intent to protect only sound-based or symbol-based communications. ██ The rule of statutory construction, *noscitur a sociis*, a word takes meaning from the company it keeps, is useful here. "A word of uncertain meaning may be known from its associates and its meaning 'enlarged or restrained by reference to the object of the whole clause in which it is used.' [Citation.]" (*Oden v. Board of Administration* (1994) 23 Cal.App.4th 194, 203 [28 Cal.Rptr.2d 388].)

██ Section 632, subdivision (a) prohibits the use of "amplifying" devices by which to "eavesdrop" on a communication that otherwise could

---

[5]The full text of section 632 is as follows: "(a) Every person who, intentionally and without the consent of all parties to a confidential communication, by means of any electronic amplifying or recording device, eavesdrops upon or records the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished by a fine not exceeding two thousand five hundred dollars ($2,500), or imprisonment in the county jail not exceeding one year, or in the state prison, or by both that fine and imprisonment. If the person has previously been convicted of a violation of this section or Section 631, 632.5, 632.6, 632.7, or 636, the person shall be punished by a fine not exceeding ten thousand dollars ($10,000), by imprisonment in the county jail not exceeding one year, or in the state prison, or by both that fine and imprisonment. [¶] (b) The term 'person' includes an individual, business association, partnership, corporation, limited liability company, or other legal entity, and an individual acting or purporting to act for or on behalf of any government or subdivision thereof, whether federal, state, or local, but excludes an individual known by all parties to a confidential communication to be overhearing or recording the communication. [¶] (c) The term 'confidential communication' includes any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any legislative, judicial, executive or administrative proceeding open to the public, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded. [¶] (d) Except as proof in an action or prosecution for violation of this section, no evidence obtained as a result of eavesdropping upon or recording a confidential communication in violation of this section shall be admissible in any judicial, administrative, legislative, or other proceeding. [¶] (e) This section does not apply (1) to any public utility engaged in the business of providing communications services and facilities, or to the officers, employees or agents thereof, where the acts otherwise prohibited by this section are for the purpose of construction, maintenance, conduct or operation of the services and facilities of the public utility, or (2) to the use of any instrument, equipment, facility, or service furnished and used pursuant to the tariffs of a public utility, or (3) to any telephonic communication system used for communication exclusively within a state, county, city and county, or city correctional facility. [¶] (f) This section does not apply to the use of hearing aids and similar devices, by persons afflicted with impaired hearing, for the purpose of overcoming the impairment to permit the hearing of sounds ordinarily audible to the human ear."

not be overheard. The statute makes clear that such a communication may be carried on by "telegraph, telephone, or other device," which transmit information by sound or symbol. (*Ibid.*)

Section 632 contains other words indicating the communications the Legislature seeks to protect are confidential communications conducted by sound or symbol. Subdivision (b) excludes from the ambit of the statute anyone known by all parties to the communication to be "*overhearing* or recording the communication." (Italics added.) Subdivision (c) excludes from the statute a communication the parties reasonably expect may be "*overheard* or recorded." (Italics added.) Subdivision (d) excludes evidence obtained as a result of "*eavesdropping* upon or recording a confidential communication" in violation of the section. (Italics added.) Subdivision (e) exempts from the statute certain "*telephonic* communication" systems. (Italics added.) Subdivision (f) exempts "*hearing* aids and similar devices, by persons afflicted with impaired *hearing*, for the purpose of overcoming the impairment to permit the *hearing* of *sounds* ordinarily *audible* to the human ear." (Italics added.)

Throughout section 632, subdivision (a), the juxtaposition of the words "eavesdrops" and "records" shows that when the Legislature used the word "records" it intended to prohibit two kinds of intrusion upon a communication: (1) a "real time" interception of a communication, by which the perpetrator listens to the communication as it occurs; and (2) a mechanical recording of a communication for later playback. The use of the word "records" was not intended as an independent basis upon which to make unlawful the photographing of conduct whether or not incident to a communication.

The language of the statute admits of no other construction than that the Legislature intended to address the interception and recording of sound-based or symbol-based communications, and that the statute protects the content of the communication from being recorded, not the non-content-based conduct coincident to the communication.

That also can be gleaned from the Legislature's written expression of its intent contained in section 630. "The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of *eavesdropping* upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." (Italics added.)

"Eavesdropping" is notably a term that refers to the surreptitious over-hearing of conversations. That is made clear in the exception which section 630 recognizes, "that law enforcement agencies have a legitimate need to employ modern listening devices and techniques in the investigation of criminal conduct . . . ." It is manifest that it is listening in or eavesdropping upon private communications that the law seeks to remedy, not the taking of pictures of people engaged in conversation or other private conduct. It is in that context that section 630 declares the policy of the statute to "protect the right of privacy of the people of this state." This policy, contrary to the reasoning in *Gibbons*, is not a source of law independent of the elements of the statutory offense spelled out in section 632. Rather, section 630 makes clear that it is "the invasion of privacy *resulting from* the . . . use of" eavesdropping devices and techniques that section 632 seeks to remedy. (Italics added.)

We conclude from the repeated use of words associated with sounds, symbols and hearing that the recordings prohibited by this statute are the recordings of the contents of audible or symbol-based communications.

The legislative history of the statute supports this conclusion. On July 28, 1967, the Legislature passed Assembly Bill No. 860. Assembly Bill No. 860 was codified in part at chapter 1.5 of the Penal Code, commencing with section 630. (Stats. 1967, ch. 1509, § 1, pp. 3584-3588.) The Digest of Assembly Bill No. 860 (As Amended, June 5, 1967) by then Assembly Speaker Jesse M. Unruh, stated that the bill would change existing law (§ 653j) by requiring all parties to a confidential communication to give their consent to having the communication listened to or recorded. "Under existing law, Penal Code Section 653j, confidential *conversations* may be eaves-dropped upon or recorded if only one party to the conversation gives his consent." (Italics added.) This shows that "communication" was equated with "conversation." (*People v. Gibbons, supra,* 215 Cal.App.3d at p. 1216 (dis. opn. of Campbell, J.).) The relevant wording of former section 653j is identical to that of section 632, suggesting the meaning of "communication" was carried over to the new law.[6]

The Statement for the Floor on Assembly Bill No. 860 (As Amended in Senate, June 16, 1967) Relating to Invasions of Privacy (Statement) states,

---

[6]Section 653j, subdivision (a) provided: "Every person or his authorized agent not a party to the communication who, intentionally and without the consent of any party to a confidential communication, by means of any electronic amplifying or recording device, eavesdrops upon or records a confidential communication, whether such communication is carried on among such parties in the presence of one another or by means of a telegraph, telephone or other device, except a radio, shall be punished by imprisonment in the county jail not exceeding one year, or by fine not exceeding one thousand dollars ($1,000), or by both such fine and imprisonment." (Stats. 1963, ch. 1886, § 1, p. 3871.)

"the measure [Assembly Bill No. 860] employs the present [section 653j] legal definition of a 'confidential communication' in defining *conversations* which would require two-party consent under the bill." (Statement, at p. 4, italics added.) Again, this shows the Legislature equated "communication" with "conversation."

The Statement also asserts the bill relates to "the use of wiretap and electronic eavesdropping devices . . ." indicating only communications which can be overheard are the subject of the bill. The Statement specifies that under prior law only one party need consent "to the *listening in*," whereas the new law would require the consent of all parties. (Statement, *supra*, at p. 2, italics added.) "Presently it is entirely legal for one who receives a *call* to be totally unaware that it is being *listened* to clandestinely by another party. Likewise, a party may *converse* in person with another party who is secretly recording the *conversation*—he may be seriously injured by that *conversation*, either personally or in his business affairs—and he has no recourse at law. Assembly Bill 860 would correct this defect." (*Ibid.*, italics added.) This is further evidence that the Legislature primarily equated "communication" with conversation, and that section 632 was meant to address sound-based communications.

These documents confirm what the language of section 632 states, that the Legislature intended to prohibit the recording of oral or telegraphic communications between two or more persons, not the photographing of two or more people carrying on a conversation. Such a video recording does not capture the communication itself, only evidence that a communication has occurred. (See *People v. Gibbons, supra,* 215 Cal.App.3d at pp. 1213-1214 (dis. opn. of Campbell, J.).) It does not amount to an intrusion on one's thoughts, ideas, or knowledge.

A better candidate to control the sort of picture taking that occurred here would be section 647, subdivision (k), which provides every person "who looks through a hole or opening, into, or otherwise views, by means of any instrumentality, including, but not limited to, a periscope, telescope, binoculars, camera, motion picture camera, or camcorder, the interior of a bathroom, changing room, fitting room, dressing room, or tanning booth, *or the interior of any other area in which the occupant has a reasonable expectation of privacy*, with the intent to invade the privacy of a person or persons inside" is guilty of a misdemeanor. (Italics added.) This passage is evidence the Legislature knows how to prohibit the video recording of private conduct, as opposed to the contents of private audible or symbol-based communication, when it chooses to do so.

We conclude that the taking of pictures of two or more people carrying on a confidential conversation does not constitute the recording of a confidential communication under the statute. We also conclude that the evidence is insufficient to constitute a violation of section 632.[7]

DISPOSITION

The judgment is reversed.

Davis, J., and Hull, J., concurred.

---

[7]We need not reach Drennan's remaining claims of instructional error regarding intent and the failure to give a unanimity instruction.